**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>JACK YITZHAK DALOYA,<br><br>                            Debtor. | Chapter 7<br><br>Case No. 12-77026 (REG)<br><br>Judge: Hon. Robert E. Grossman |

**REPLY TO DEBTOR'S OPPOSITION TO MOTION OF CONSUMER FIRST**
**PLAINTIFFS TO REOPEN CLOSED CHAPTER 7 CASE AND**
**TO PERMIT FILING A COMPLAINT TO DETERMINE**
**<u>NONDISCHARGEABILITY OF THEIR CLAIMS</u>**

The Consumer First Plaintiffs[1] hereby file this Reply to the objection of the Debtor to the motion of Consumer First Plaintiffs to reopen closed Chapter 7 case and to permit filing of a complaint to determine the nondischargeability of their claims [ECF No. 27].

**<u>PRELIMINARY STATEMENT</u>**

In opposing the reopening of his closed Chapter 7 case, the Debtor asks the Court to disregard the notice requirements of section 523(a)(3)(B) of the Bankruptcy Code and to impose a diligence obligation on creditors that is unsupported by any authority. In attempting to justify this request, the Debtor offers only a mischaracterization of the events giving rise to the Consumer First Plaintiffs' claims that downplays his role in the fraudulent scheme operated by Consumer First. The Court should reject these arguments

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Notice and Motion of Consumer First Plaintiffs to Reopen Closed Chapter 7 Case and to Permit Filing a Complaint to Determine Nondischargeability of Their Claims (the "Motion"). Debtor's Opposition to the Motion, dated March 23, 2015, is referred to as the "Opposition" or "Opp." Citations in the form "Miller Opp. Aff.__" are exhibits to the Affirmation of Andrea E. Miller, filed in conjunction with the Opposition.

and exercise its discretion to reopen the Debtor's case so that the Consumer First Plaintiffs can pursue the determination of nondischargeability they are entitled to.

## ARGUMENT

### I. The Consumer First Plaintiffs have nondischargeable claims under section 523(a)(3)(B) of the Bankruptcy Code

A. <u>Davis Polk did not have notice of Daloya's bankruptcy</u>

To have sufficient notice of a bankruptcy for the purposes of section 523(a)(3)(b) a creditor must have "notice or actual knowledge of the **case** in time for" the timely filing of a proof of claim and timely request for determination of dischargeability of the debt owed by the creditor. 11 U.S.C. § 523(a)(3)(B). Without requisite notice, a creditor's time to file such a request is not limited. Fed. R. Bankr. P. 4007(b); *see also In re Candidus*, 327 B.R. 112, 117 (Bankr. E.D.N.Y. 2005).

The Debtor admits in his Opposition that the claims of the Consumer First Plaintiffs were known to him when he decided to file for bankruptcy, (Opp. 11), and concedes that the Consumer First Plaintiffs were "omitted" from the Schedules when the Schlissel Law Firm filed the Debtor's Chapter 7 petition. (Opp. 3, 12). The Debtor also concedes that neither Davis Polk nor the Consumer First Plaintiffs "receive[d] formal notice from the Bankruptcy Court." (Opp. 12). Lastly, the Debtor does not dispute that Davis Polk did not receive actual notice, formal or otherwise, of the Debtor's bankruptcy case until well after the deadline to file a nondischargeability complaint had passed. (Mot. 16).

The Debtor's only argument is that a notice to Davis Polk of the Debtor's theoretical *intention to file* for bankruptcy on an unspecified date an estimated *two to six months in the future* should satisfy the notice requirement under section 523(a)(3)(B), and

that this notice somehow imposed upon Davis Polk an obligation to investigate continually whether or not the Debtor had in fact sought bankruptcy protection in order to protect the Consumer First Plaintiffs' rights. (Opp. 8). This is unavailing.

None of the cases cited by the Debtor support this novel argument, as all involve creditors that received **actual notice of the bankruptcy** well before the deadline to file a nondischargeability complaint, not notice of a theoretical intent to seek bankruptcy protection at some unspecified date in the future. In *In re Elias*, *Franzone v. Elias (In re Elias)*, 2014 U.S. Dist. LEXIS 39591 (E.D.N.Y. Mar. 25, 2014), counsel for a creditor in a state court action was **formally mailed** notice of the bankruptcy filing by the Bankruptcy Court and had received a copy of the bankruptcy petition prior to the deadline. In both *Massa v. Addona (In re Massa),* 187 F.3d 292 (2d Cir. 1999) and *GAC Enterprises, Inc. v. Medaglia (In re Medaglia),* 52 F.3d 451 (2d Cir. 1995), the creditors received **actual notice** of the bankruptcy case **more than fifty days** before the deadline to file a nondischargeability complaint. The Second Circuit held in both cases that a creditor who has "timely, actual knowledge of the 'case' does not have the 'right to assume' that it will receive formal notice." (emphasis added). None of these cases are analogous to what occurred here. Neither Davis Polk, nor the Consumer First Plaintiffs, ever received timely actual notice, formal or otherwise, of the **actual, filed** bankruptcy case. The only "notice" that the Debtor asserts Davis Polk received was notice that Daloya had not yet filed a bankruptcy but intended to do so on an unspecified date two to six months in the future.[2] In addition, while Ms. Miller's affirmation refers to communications on June 8, 2012, this is not reflected in the billing records attached to

---

[2] Notably, Daloya did not file his bankruptcy within this window.

3

her affirmation (Miller Opp. Aff. Ex. D [ECF No. 27-6]), and is inconsistent with the recollection of Ms. Stillman, as set out in her declaration dated January 16, 2015 [ECF No. 20]. Under these circumstances, the Consumer First Plaintiffs were well within their due process rights to assume that they, or their attorneys, would receive some notice if and when the "promised" bankruptcy filing was actually filed, so that they would have sufficient time to file their nondischargeability complaint. As the Debtor has conceded, no such notice was ever given.

### B. No due diligence requirement under section 523(a)(3)(b)

Section 523(a)(3)(b) clearly and unambiguously places the burden on the Debtor to notify its creditors of the bankruptcy. Notwithstanding this clear statutory requirement, the Debtor asserts that because Davis Polk was aware that "Mr. Daloya had retained counsel for the express purpose of filing a bankruptcy case," (Opp. 4), "[it] was required to exercise due diligence and pick up the phone to call Ms. Miller to find out the status of the promised bankruptcy filing." (Opp. 13). Unsurprisingly, the Debtor cites no authority for the proposition that mere notice of the possibility of a future bankruptcy filing requires a creditor to investigate continually whether the potential bankruptcy filing has in fact occurred, because there is none. The Debtor also does not address the question of how frequently and for how long a creditor would be required to investigate under this proposed unprecedented rule, as asking that question highlights the inequity of the rule. In any event, after not hearing anything further from Daloya's counsel for months regarding his intention to file for bankruptcy, Davis Polk in fact *did investigate* in October 2012 whether Daloya had filed a bankruptcy when reviewing the status of the defaulting defendants in the Lawsuit to prepare a motion for default judgment, and confirmed that he had not. (Stillman Decl. ¶¶ 8-9 [ECF No. 20]).

The absence of a creditor due diligence requirement is clear in the statutory text of section 523(a)(3)(b) and supported by good policy, because it would be inequitable to place an unmanageable burden on creditors to investigate continuously whether a bankruptcy had actually been filed at any time when such a case may potentially exist but no notice of its existence had been given. Under the Debtor's proposed rule, in order to protect its rights, a creditor would have to investigate continually whether a rumored bankruptcy had actually occurred, potentially daily for an indefinite period, a clearly unmanageable standard. Because of this, the Bankruptcy Code clearly places the burden on the debtor to notify creditors of his bankruptcy case in order to obtain the benefits of bankruptcy.

## II. The Consumer First Plaintiffs have nondischargeable fraud claims of the kind specified in section 523(a)(2)

To attempt to bolster his opposition to the reopening of his bankruptcy and downplay the Consumer First Plaintiffs' claims, the Debtor mischaracterizes the relevant facts giving rise to the claims and his own role in the fraudulent Consumer First scheme, asserting that he was "employed by [Consumer First] as a team leader for a few months" and that his "duties were limited to making sure that the four or five salespeople on [his] team were following up on leads given to them by upper management and not wasting company time." (Daloya Aff. ¶ 3; Opp. 16). The Debtor further asserts that the Consumer First Plaintiffs' fraud claims are based not on "proven moral turpitude or intentional wrong," but rather are "based merely on his prior employment." (Opp. 4, 16). To the contrary, the Consumer First Plaintiffs have clearly alleged "positive fraud, or fraud in fact, involving moral turpitude or intentional wrong." *See In re Newmark,* 20 B.R. 842 (Bankr. E.D.N.Y. 1982).

5

Far from the minor role that the Debtor now asserts, the evidence shows that the Debtor was one of the core perpetrators of the Consumer First fraud. The Debtor and Guy Samuel, one of the owners, shared an office just outside of the room with the salespeople. (Tr. of Feb. 25, 2015 Dep. of Kevin Quinn at 25:6-7, Vonnegut Reply Decl., Ex. A). Testimony indicates that it was the Debtor who, together with Samuel, ran weekly sales meetings at which salespeople were given instructions on how to carry out the company's fraudulent practices. (*Id.* at 39:19-40:4). Indeed, one former salesperson testified that the Debtor and Samuel were "in charge of Consumer First['s] . . . day to day operations." (*Id.* at 63:17-24).

The evidence shows that at the weekly sales meetings run by the Debtor and Samuel, the salespeople were instructed to tell clients, among other things, that "you are going to lose your home if you don't do something," and other such threats. (*Id.* at 40:15-22). They were instructed to tell clients that if they engaged Consumer First, their lenders could not foreclose on their homes—a blatant falsehood, given that some of the Consumer First Plaintiffs subsequently lost their homes to foreclosure. (*Id.* at 228:16-229:4). The Debtor and Samuel told salespeople to lie about Consumer First's success rate (*id.* at 230:2-16), and Consumer First's relationship with lenders (*id.* at 243:17-244:5), and they told the salespeople to tell clients not to contact their lenders (*id.* at 234:21-235:2), and not to pay their mortgages so as to get a negotiation advantage (*id.* at 250:3-10). Samuel and the Debtor told the salespeople at Consumer First to say "whatever you have to say to make our company look like we know what we are doing." (*Id.* at 109:10-21). The Debtor also did nothing when, early in Consumer First's

lifespan, he was informed (if he was not already aware) that the salespeople were saying inaccurate things to potential customers. (*Id.* at 141:8-146:1).

Other witnesses have testified that Daloya was, in fact, a partner at Consumer First Law Group. Samuel testified in his deposition that "Jake [Daloya] wasn't getting money that he was supposed to get so Steve [Grivas] told, you know, kind of forced me to have him come on as a partner." (Tr. of Aug. 14, 2012 Dep. of Guy Samuel at 129:8-24 (Vonnegut Reply Decl., Ex. B); *see also id.* at 143:17-24 ("Q: And you mentioned before that Jake Daloya came on later as a partner? A: Correct.")). The Debtor's explanation to his former attorney that he held only an "entry level position for a brief period and did not have any equitable interest in said company(ies) or managerial role" is belied by the evidence on the record.[3]  (Opp. 6-7).

Far from having a minor role in the fraud, the evidence indicates that Daloya helped create Consumer First, and he stayed until it collapsed. The Debtor has admitted that Consumer First was formed when "Guy [Samuel] explained to me that he wanted to break loose from Homesafe America . . . and I found a friend of mine that invested and gave him the start-up capital to get the Consumer First going." (Tr. of Sept. 9, 2011 Dep. of Jake Daloya at 46:8-20,  Vonnegut Reply Decl., Ex. C). And Daloya admitted that he remained at Consumer First until the scam started to unravel—he stopped working at Consumer First in July of 2011 because "[i]t was driving me crazy . . . I know Google shut down the leads. . . . [B]asically the leads weren't coming in for the guys to work. Nobody was making money and I left." (Daloya dep. at 80:14-81:6).

---

[3] The Debtor's objection that he could not legally be a law firm "partner" of Consumer First, as he was not an attorney, also misses the point. Daloya and Samuel were capable of being **business partners** of **Consumer First Corporation** (Opp. 7.)

The Consumer First Plaintiffs alleged a claim of aiding and abetting fraud against the Debtor not because they are trying to "cast a wide net," (Opp. 7), but rather because the Debtor, as a partner, floor manager, and team leader, was intimately involved with the fraudulent loan modification scheme being perpetuated by Consumer First and was aware of and expressly encouraged the salespeople at Consumer First to make misleading representations. The evidence in the record belies any notion that the Debtor's actions did not involve "moral turpitude" or "intentional wrong." The Debtor cannot seek to avoid liability because he did not himself make the misrepresentations to consumers when he directed others to do so and profited from their actions.

**III.     The Court should exercise its discretion to reopen Daloya's bankruptcy case**

Lastly, both law and equity support the reopening of this Chapter 7 case. Section 350(b) requires the Consumer First Plaintiffs only to make a "colorable showing," and not to prove their claims, at this stage. *In re Garland*, 501 B.R. 195, 201 (Bankr. S.D.N.Y. 2013). As shown in the Motion and discussed above, the claim for relief in this case is far more than colorable. The Consumer First Plaintiffs assert strong fraud claims against Daloya and, as is conceded by the Debtor, were not given notice of his bankruptcy. Based on this, the Consumer First Plaintiffs expect to prevail in having their claims against Daloya determined nondischargeable. The Consumer First Plaintiffs have already obtained default judgment against numerous of the defendants in the Lawsuit, and are continuing to pursue the remaining defendants in state court.

Equitable considerations also favor a reopening of this case. The Consumer First Plaintiffs have alleged, and introduced evidence to demonstrate, that Daloya was personally intertwined in the fraud, a fraud that had significant consequences for the

Consumer First Plaintiffs' lives.  Daloya should not be able to escape responsibility for his actions simply by "omit[ting]" the Consumer First Plaintiffs from his filing.

## CONCLUSION

For the foregoing reasons, the Consumer First Plaintiffs respectfully request that the Court grant the relief requested in the Motion and such other and further relief as is just and proper.

Dated: April 10, 2015
New York, New York

Respectfully submitted,

s/ Arie M. Rubenstein
Arie M. Rubenstein
Daniel F. Kolb
Eli J. Vonnegut
Jillian Rennie Stillman
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000

*Attorneys for Consumer First Plaintiffs*