**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>JACK YITZHAK DALOYA,<br><br>                           Debtor. | Chapter 7<br><br>Case No. 12-77026 (REG)<br><br>Judge:  Hon. Robert E. Grossman |
| DARLENE HENSON, KATHIE CRETE, DAVID CRETE, JUDY JOHNS, RANDALL JOHNS, BONNIE SCARBOROUGH, JAMES HEGLER, DEBORAH HEGLER, LORRAINE BOARDWINE, RANDY BOARDWINE, MICHAEL ELLIS, TINA ELLIS, PHILLIP STANFORD, SHAKIRAH STANFORD, CAROLYN CAMPBELL, ANDREA NIEDELMAN, BARRY NIEDELMAN, LEVI GALES, HEATHER RISCH AND RANDALL WITT,<br><br>                       Plaintiffs,<br><br>    -against-<br><br>JACK YITZHAK DALOYA,<br><br>                       Defendant. | Adversary No. --------- |

**COMPLAINT TO DETERMINE NONDISCHARGEABILITY OF**
**CLAIMS UNDER SECTIONS 523(a)(2) AND 523(a)(3)(B)**

Plaintiffs Darlene Henson, Kathie Crete, David Crete, Judy Johns, Randall Johns,

Bonnie Scarborough, James Hegler, Deborah Hegler, Lorraine Boardwine, Randy

Boardwine, Michael Ellis, Tine Ellis, Phillip Stanford, Shakirah Stanford, Carolyn

Campbell, Andrea Niedelman, Barry Niedelman, Levi Gales, Heather Risch, and Randall

Witt (collectively, the "**Consumer First Plaintiffs**"), for their complaint against

Defendant-Debtor Jack Yitzhak Daloya ("**Daloya**"), respectfully represent the following:

1.      The Consumer First Plaintiffs, along with others (the "**United Solutions Plaintiffs**"), are plaintiffs (collectively, the "**Squassoni Plaintiffs**") in the pending state court lawsuit in New York State Supreme Court, Nassau County, Index No. 3571/12, entitled *Squassoni et al. v. Blackwell et al.* (the "**Lawsuit**") against Daloya, Anthony Blackwell ("**Blackwell**"), Consumer First Corporation ("**CF Corp.**"), Consumer First Law Group LLC ("**CFLG**"), Blackwell's Attorneys LLC ("**Blackwell's Attorneys**") and several other defendants (collectively, the "**Defendants**").  The Squassoni Plaintiffs filed a Verified Amended Complaint (the "**Verified Complaint**") on May 15, 2012.[1]

2.      In support of the facts asserted in this Complaint, the Consumer First Plaintiffs have filed the following documents: (i) the *Declaration of Jillian Rennie Stillman in Support of Consumer First Plaintiffs' Motion to Reopen Closed Chapter 7 Case and to Permit Filing a Complaint to Determine Nondischargeability of Their Claims*, dated January 16, 2015 (the "**Stillman Declaration**") [ECF No. 20]; (ii) the *Declaration of Linda H. Mullenbach in Support of Consumer First Plaintiffs' Motion to Reopen Closed Chapter 7 Case and to Permit Filing a Complaint to Determine Nondischargeability of Their Claims*, dated January 14, 2015 (the "**Mullenbach Declaration**") [ECF No. 22]; (iii) the *Declaration of Eli J. Vonnegut in Support of Consumer First Plaintiffs' Motion to Reopen Closed Chapter 7 Case and to Permit Filing a Complaint to Determine Nondischargeability of Their Claims*, dated January 16, 2015 (the "**Vonnegut Declaration**") [ECF No.  21]; and (iv) the *Declaration of Eli J. Vonnegut in Support of Reply to Debtor's Opposition to Motion of Consumer First Plaintiffs to Reopen Closed Chapter 7 Case and to Permit Filing a Complaint to*

---

[1] *See* Verified Compl., Vonnegut Decl., Ex. A.

*Determine Nondischargeability of Their Claims*, dated April 10, 2015 (the "**Vonnegut Reply Declaration**") [ECF No. 31].

3.      In the Verified Complaint, the Squassoni Plaintiffs allege nine causes of action, including common-law fraud, arising from two businesses operated by the Defendants.[2]  The Defendants represented to vulnerable and financially distressed homeowners that they possessed specialized knowledge, relationships and skills that enabled them to lower each homeowner's monthly mortgage payments in exchange for an upfront fee.[3]  The Defendants baited homeowners by representing that their companies were law firms.[4]  They virtually guaranteed each homeowner a successful mortgage loan modification[5] and often promised to refund the homeowner's upfront fee if they could not modify the homeowner's loan.[6]  The Defendants failed to deliver the promised loan modifications, refused to refund the homeowners' upfront fees and actively avoided communication with the homeowners after receiving their upfront fees.[7]

4.      On December 6, 2012 (the "**Petition Date**"), Daloya commenced a voluntary case under chapter 7 of title 11 of the United States Code (the "**Bankruptcy Code**") in this Court, Case No. 12-77026, but he did not schedule any of the Squassoni Plaintiffs in his petition for bankruptcy relief [ECF No. 1].  An Order of Discharge was entered on March 12, 2013 pursuant to section 727 of the Bankruptcy Code [ECF No. 16].

---

[2] Verified Compl. ¶¶ 619-90, Vonnegut Decl., Ex. A.
[3] Verified Compl. ¶¶ 105-66, 619-90, Vonnegut Decl., Ex. A.
[4] Verified Compl. ¶ 11, Vonnegut Decl., Ex. A.
[5] Verified Compl. ¶ 10, Vonnegut Decl., Ex. A.
[6] Verified Compl. ¶¶ 12, 138, Vonnegut Decl., Ex. A.
[7] Verified Compl. ¶¶ 167-618, Vonnegut Decl., Ex. A.

5.      Davis Polk & Wardwell LLP ("**Davis Polk**"), which represents the Squassoni Plaintiffs in connection with the Lawsuit, did not receive notice of Daloya's bankruptcy filing until April 18, 2013, more than a month after his discharge.  Thereafter, Davis Polk notified its cocounsel in the Lawsuit, Linda H. Mullenbach and Meredith Horton for the Lawyers' Committee for Civil Rights Under Law.  Neither Squassoni Plaintiffs nor their counsel were notified of Daloya's bankruptcy until after his discharge. Nor were any of those parties aware of Daloya's bankruptcy until after his discharge.[8]

6.      On June 8, 2015, this Court granted the Consumer First Plaintiffs' motion to reopen Daloya's bankruptcy and permission to file a complaint to determine the nondischargeability of their claims [ECF. No. 33].

7.      The Consumer First Plaintiffs received no notice of Daloya's bankruptcy and have nondischargeable fraud claims against Daloya based on his role in one of two fraudulent loan modification businesses as pleaded in the Verified Complaint.  As a result, the Consumer First Plaintiffs bring this adversary complaint to obtain an Order and Judgment finding their claims asserted in the Lawsuit against Daloya to be nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2) and 523(a)(3)(B) and Rule 4007(a) and (b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

**Jurisdiction and Venue**

8.      The Court has subject-matter jurisdiction to consider this adversary proceeding pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and may be determined by the Court.  Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

---

[8] *See* Mullenbach Decl.; Sillman Decl..

## **Factual Background**

**I.    The Fraud**

9.    The Consumer First Plaintiffs are a group of low- and middle-income homeowners from several states across the country, including New York, who suffered financial hardship and struggled to stay current on their monthly mortgage payments.[9] When they searched for help, the Consumer First Plaintiffs became victims of false advertising, deceptive practices, and fraud, carried out by Daloya and others.[10]

10.    As pleaded in the Verified Complaint, the Defendants operated two fraudulent loan modification businesses: the Consumer First loan modification business ("**Consumer First**")[11] and another, separate loan modification business, known to customers as "United Solutions Law Firm" ("**United Solutions**"),[12] both of which were created by Blackwell.  Daloya was a partner, floor manager and team leader at Consumer First.[13]

11.    Before creating Consumer First and United Solutions, Blackwell was employed at Homesafe America, Inc. ("**Homesafe**"), a Nassau County for-profit

---

[9] Verified Compl. ¶¶ 167-618, Vonnegut Decl., Ex. A.

[10] Verified Compl. ¶¶ 167-618, Vonnegut Decl., Ex. A.

[11] Verified Compl. ¶ 46, Vonnegut Decl., Ex. A.  CF Corp., CFLG and Blackwell's Attorneys constituted the single loan modification business known to customers primarily as "Consumer First Law Group," and at times as "Blackwell's Attorneys."  There is no practical difference between CF Corp., CFLG and Blackwell's Attorneys in the operation of the business, the management of their employees or employee practices.  Accordingly, CF Corp., CFLG and Blackwell's Attorneys are referred to as the single business "Consumer First" in this Complaint.

[12] Verified Compl. ¶¶ 7-10, 42, Vonnegut Decl., Ex. A.  United Legal Solutions, Incorporated ("**ULS Inc.**") and United Solutions Law Firm LLC ("**USLF**") constituted the single loan modification business of United Solutions.  There is no practical difference between ULS Inc. and USLF in the operation of their business, the management of their employees or employee practices.  Accordingly, ULS Inc. and USLF are referred to as the single business "United Solutions" in this Complaint.

[13] Tr. of Sept. 9, 2011 Dep. of Jake Daloya, 64:23-25, Vonnegut Decl., Ex. C; Tr. of Aug. 14, 2012 Dep. of Guy Samuel, 129:8-24, Vonnegut Decl., Ex. D; Tr. of Aug. 25, 2011 Dep. of Aren Goldfaden, 193:4-11, Vonnegut Decl., Ex. E; Tr. of Feb. 25, 2015 Dep. of Kevin Quinn at 25:6-7, 39:19-40:4, 63:17-24 ("**Quinn dep**"), Vonnegut Reply Decl., Ex. A

mortgage modification company that is currently the subject of a similar lawsuit.[14]  In the course of his employment with Homesafe, Blackwell learned about two laws that prohibited demanding upfront fees for mortgage modification work.  Those two laws, he learned, were subject to a narrow exception which allowed attorneys to charge an upfront fee for providing distressed mortgage consulting.[15]  Attorneys were eligible for this exception if they were admitted to practice in the State of New York and offered the mortgage modification services in the course of their regular legal practice.[16]

12.     Blackwell was admitted to practice as an attorney in Nevada only, had never been admitted to practice law in the State of New York and did not offer loan modification services in the course of his regular legal practice.[17]  Despite being ineligible for the exception to the statute prohibiting the collection of upfront fees, Blackwell created Consumer First and United Solutions in New York as "law firms" to make it appear lawful for him and his partners to collect upfront fees.  Blackwell was the only purported attorney for both businesses, except for a brief time when a junior attorney was employed and then resigned.[18]

13.     Daloya became involved with Blackwell and Consumer First at Consumer First's inception and helped find investors and office space for the new company.[19]  At

---

[14] *Mook v. Homesafe America Inc.*, No. 9472/11 (Sup. Ct. Nassau Cnty.).

[15] Verified Compl. ¶ 4, Vonnegut Decl., Ex. A.

[16] *See* N.Y. R.P.L. § 265-b; 16 C.F.R. Part 322.

[17] During the time period relevant to this action, Blackwell was a member of the bar of the State of Nevada.  As of the date of this filing, Blackwell is no longer licensed to practice law in any jurisdiction because he was suspended from the Nevada bar for failure to pay dues in February 2012.  Verified Compl. ¶¶ 6, 47 Vonnegut Decl., Ex. A.

[18] Verified Compl. ¶¶ 92, 112, 129, Vonnegut Decl., Ex. A.

[19] Tr. of Sept. 9, 2011 Dep. of Jake Daloya, 46:10-46:20, 56:2-56:7, 75:16-75:19, Vonnegut Decl., Ex. C.

Consumer First, he was a partner, floor manager, and team leader.[20]  Daloya hired and

trained a team of salespeople who called potential customers and induced them to pay

upfront fees to Consumer First.[21]  Daloya supervised the sales team and oversaw the day-

to-day operations of Consumer First, sitting behind members of the sales team and

watching over them.[22]  He watched his team as they worked to make sure that they were

selling, and he distributed the names of potential customers ("leads") to the sales staff.[23]

Twelve members of the Consumer First sales team are now Defendants in the Lawsuit.[24]

14.    Consumer First lured its customers through a series of misleading and

deceptive interactions designed to gain the unsuspecting customer's trust.[25] Consumer

First established a website that boasted to potential customers that the company was

experienced in providing legal services to obtain mortgage modifications.[26]  Purporting to

offer unique expertise, legal knowledge, and a means to successfully navigate the

daunting loan modification process, Consumer First enticed the potential customer to

enter his or her information on the website.[27]  By establishing links to the website on

seemingly legitimate sites, such as obamaHAMP.net, and designing a website that would

---

[20] Tr. of Sept. 9, 2011 Dep. of Jake Daloya, 64:23-64:25, Vonnegut Decl., Ex. C; Tr. of Aug. 14, 2012 Dep. of Guy Samuel, 129:8-129:24, Vonnegut Decl., Ex. D; Tr. of Aug. 25, 2011 Dep. of Aren Goldfaden, 193:4-193:11, Vonnegut Decl., Ex. E; Quinn dep at 25:6-7, 39:19-40:4, 63:17-24, Vonnegut Reply Decl., Ex. A.

[21] Tr. of Aug. 25, 2011 Dep. of Aren Goldfaden, 193:17-193:24, Vonnegut Decl., Ex. E; Tr. of Aug. 17, 2011 Dep. of Matthew J. Lapides, 135:6-135:20, Vonnegut Decl., Ex. F; Quinn dep at 25:6-7, 39:19-40:4, 63:17-24, Vonnegut Reply Decl., Ex. A.

[22] Tr. of Aug. 17, 2011 Dep. of Matthew J. Lapides, 73:20-73:25, 104:14-104:19, Vonnegut Decl., Ex. F.

[23] Verified Compl. ¶ 97, Vonnegut Decl., Ex. A.

[24] Verified Compl. ¶¶ 49-62, Vonnegut Decl., Ex. A.

[25] Verified Compl. ¶¶ 105-66, Vonnegut Decl., Ex. A.

[26] Id.

[27] Id.

appear in search results for information on mortgage modifications, Customer First was able to engage the homeowner.[28]

15.    After Consumer First lured the homeowner to enter his or her personal information on the website, a Consumer First salesperson would then call the customer.[29] The salesperson would tell the customer that Consumer First was a law firm run by an attorney with more than a decade of experience.[30]  The salesperson would say that Consumer First had an incredibly high success rate in obtaining mortgage modifications.[31]  The salesperson also would say that the attorney would not accept the customer's "case" unless he was sure that the customer qualified for a mortgage modification.[32]  If the customer was skeptical, the salesperson would give a virtual guarantee of success and promise a refund if Consumer First did not successfully modify the homeowner's loan.[33]  To pressure the customer to decide quickly, the salesperson would impose an arbitrary deadline for the customer to hire Consumer First.[34]  Once the customer agreed, the salesperson would send a boilerplate form contract, among other forms, and direct the customer to send an upfront payment along with the completed forms as soon as possible.[35]

16.    Each Consumer First Plaintiff experienced a nearly identical sales pitch:[36] For a one-time upfront fee, the Consumer First "law firm" would negotiate with the customer's lender to lower the customer's monthly mortgage payments.  The customer

---

[28] Id.
[29] Id.
[30] Id.
[31] Id.
[32] Id.
[33] Id.
[34] Id.
[35] Id.
[36] Verified Compl. ¶¶ 105-66, 619-90, Vonnegut Decl., Ex. A.

need not make mortgage payments until the negotiation period was complete.  The Consumer First team would be available to the homeowner on a "24/7" basis to answer questions.  At least one Consumer First "attorney" or an affiliated attorney who was licensed to practice law in the customer's jurisdiction would supervise the modification application process or would negotiate with the customer's lender.  By hiring the company, the Consumer First Plaintiffs were told explicitly that they were retaining the legal services of a law firm.[37]

17.     After they sent their upfront payments, each Consumer First Plaintiff experienced a similar fallout.[38]  The "24/7" sales team at Consumer First became unreachable.  Over time, the Consumer First Plaintiffs realized that although they had stopped making mortgage payments, their mortgages were not being renegotiated.  They realized that neither the loan modification nor the refund would arrive.  In most cases, they discovered that Consumer First had not even been in contact with their lenders.[39]

18.     Consumer First's scheme depended on Consumer First pocketing fees (and the sales teams, commissions) without performing the services the business purported to be selling.  And Daloya benefited from the process directly.  According to Daloya, for every upfront fee that his team collected, Daloya received a 5% commission after Blackwell's fee was taken off the top.[40]

19.     Daloya facilitated Consumer First's fraud at every stage of the process.  He hired and trained the salespeople at Consumer First.[41]  He distributed the names of

[37] Verified Compl. ¶¶ 105-66, 619-90, Vonnegut Decl., Ex. A.
[38] Verified Compl. ¶¶ 105-66, 619-90, Vonnegut Decl., Ex. A.
[39] Verified Compl. ¶¶ 105-66, 619-90, Vonnegut Decl., Ex. A.
[40] Tr. of Sept. 9, 2011 Dep. of Jake Daloya, 68:23-70:6, Vonnegut Decl., Ex. C.
[41] Tr. of Sept. 9, 2011 Dep. of Jake Daloya, 64:23-64:25, Vonnegut Decl., Ex. C; Tr. of Aug. 14, 2012 Dep. of Guy Samuel, 129:8-129:24, Vonnegut Decl., Ex. D; Tr. of Aug. 25, 2011 Dep. of Aren (….continued)

potential leads to the sales staff.[42]  As they worked, he watched them to make sure they were selling and encouraged them to say things he knew were false to ensure they made the sale.[43]  And when a customer was able to reach his team after sending the upfront payment, Daloya himself handled the complaints and refund requests.[44]

20.    Though Daloya engaged in business activities in the State of New York, offering loan modification services to consumers, he was not registered as a mortgage broker with the New York State Banking Department as required by New York State law.[45]

21.    As pleaded in the Verified Complaint, as a direct and proximate result of the Defendants' actions, including Daloya's, each of the Consumer First Plaintiffs lost his or her upfront payments to Consumer First and suffered further damages to be determined at trial as part of the Lawsuit.[46]

22.    On September 16, 2014, in a state court hearing to determine damages against the defaulting Defendants in the Lawsuit (not including Daloya), the Honorable Randy Sue Marber ruled that the Squassoni Plaintiffs should be awarded compensatory, statutory, exemplary, and punitive damages.[47]  The damages award would treble and, in some cases, quadruple the Squassoni Plaintiffs' compensatory damages against those Defendants.  A final order on damages is pending.

---

(continued….)

Goldfaden, 193:4-193:11, Vonnegut Decl., Ex. E; Quinn dep at 25:6-7, 39:19-40:4, 63:17-24, Vonnegut Reply Decl., Ex. A.

[42] Id.

[43] Id.

[44] Tr. of Aug. 25, 2011 Dep. of Aren Goldfaden, 254:1-254:16, Vonnegut Decl., Ex. E.

[45] Verified Compl. ¶ 48, Vonnegut Decl., Ex. A.

[46] Verified Compl. ¶¶ 674-79, Vonnegut Decl., Ex. A.

[47] Tr. of Inquest Before Hon. Randy Sue Marber, Sept. 16, 2014, Vonnegut Decl., Ex. B.

## II.    Daloya's Bankruptcy

23.    The Consumer First Plaintiffs and the United Solutions Plaintiffs served Daloya with the complaint in the Lawsuit via substitute service on March 27, 2012.[48] Daloya was undeniably aware of the Lawsuit because he signed a stipulation extending his time to answer the Verified Complaint on or about June 13, 2012.[49]

24.    In April 2012, Daloya's bankruptcy counsel, Andrea E. Miller of the Law Office of Elliot S. Schlissel ("**Miller**"), informed Davis Polk that Daloya planned to file for bankruptcy within the next six weeks to two months.[50]  Davis Polk followed up with a docket search in October 2012, but Daloya had not filed.[51]

25.    On December 6, 2012, almost eight months after informing Davis Polk that he might file for bankruptcy, Daloya filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of New York (the "**Petition**") [ECF No. 1].  At that time, as stated in the Stillman Declaration, he did not notify the Squassoni Plaintiffs, Davis Polk or Linda H. Mullenbach or Meredith Horton of the Lawyers' Committee for Civil Rights Under Law of his bankruptcy [ECF Nos. 5 and 6].

26.    Daloya did not schedule any of the Squassoni Plaintiffs on his lists of creditors holding unsecured nonpriority claims [ECF No. 1].  At all times, the Squassoni Plaintiffs, Davis Polk and Linda H. Mullenbach and Meredith Horton of the Lawyers' Committee for Civil Rights Under Law were excluded from Daloya's schedules, including when Daloya filed amended schedules on January 18, 2013 [ECF No. 9] and

---

[48] Affidavit of Service, Mar. 29, 2014, Vonnegut Decl., Ex. G.
[49] Stipulation to Extend Time, June 8, 2012, Stillman Decl., Ex. A.
[50] *See* Stillman Decl..
[51] Id.

additional amended schedules on February 20, 2013 [ECF No. 12].  Although the Lawsuit was listed in Daloya's Chapter 7 petition Statement of Financial Affairs, the Squassoni Plaintiffs were not listed or scheduled on Daloya's lists of creditors at any time, nor were they included in Daloya's creditor mailing matrix at any time.

27.    On March 12, 2013, this Court entered an Order of Discharge pursuant to section 727 of the Bankruptcy Code [ECF No. 16], and on May 16, 2013, the case was closed [ECF No. 18].  The BNC Certificate of Mailing for the discharge did not include any of the Squassoni Plaintiffs, Davis Polk, Linda H. Mullenbach, Meredith Horton, the Lawyers' Committee for Civil Rights Under Law or the state court in Nassau County, where the Lawsuit was pending [ECF No. 17].

28.    As stated in the Stillman Declaration, neither the Squassoni Plaintiffs, Davis Polk, Linda H. Mullenbach, Meredith Horton nor the Lawyers' Committee for Civil Rights Under Law received any notice of Daloya's bankruptcy filing until after his discharge, and none of them were otherwise aware of the filing until then.[52]

29.    More than a month after Daloya's discharge, Davis Polk first received notice of Daloya's bankruptcy filing in a letter dated April 18, 2013 from Miller stating that Daloya had filed for bankruptcy the prior December and representing that the Lawsuit "is listed on Mr. Daloya's petition."  Miller stated that "[a]s of the filing date, an automatic stay has been granted by the United States Bankruptcy Court" and directed Davis Polk to "cease and desist from taking any further legal action against [Daloya]."[53]

---

[52] *See* Mullenbach Decl.; Stillman Decl..
[53] Letter from Andrea E. Miller to Daniel F. Kolb, Apr. 18, 2013, Stillman Decl., Ex. B.

30.     Davis Polk thereafter informed Linda H. Mullenbach of the Lawyers' Committee for Civil Rights Under Law of Daloya's bankruptcy filing.[54]

31.     On May 15, 2013, the Chapter 7 Trustee's Report of No Distribution was entered, and on May 16, 2013, the case was closed [ECF No. 18].

32.     During the week of May 20, 2013, two attorneys at Davis Polk called Pryor & Mandelup LLP ("**Pryor & Mandelup**"), counsel to Robert Pryor, the Chapter 7 trustee in Daloya's bankruptcy.  On May 24, 2013, an attorney at Davis Polk followed up by email with Barbara Anson, a bankruptcy paralegal at Pryor & Mandelup, asking her "to confirm (a) that the bankruptcy stay is officially lifted, and (b) . . . that the trustee will have no problem with us seeking a default judgment on the nondischargeable fraud claim against [Daloya]."[55]  Davis Polk never received a response to this email.

33.     On June 7, 2013, the Squassoni Plaintiffs moved to discontinue the Lawsuit as against Daloya, without prejudice, to ensure that they did not violate the Court's Order of Discharge.  They reserved the right to bring suit later on their nondischargeable fraud claims.  The state court in Nassau County entered an order on August 14, 2013, granting the motion for voluntary discontinuance without prejudice.[56]

34.     The Lawsuit is currently in the discovery phase as against the nondefaulting Defendants.

---

[54] *See* Mullenbach Decl.; Stillman Decl..
[55] Email from Davis Polk to Barbara Anson, May 24, 2013, Stillman Decl., Ex. C.
[56] Order, Aug. 9, 2013, Vonnegut Decl., Ex. H; Motion for Voluntary Discontinuance as to Defendant Jake Daloya Only, June 7, 2013, Vonnegut Decl., Ex. I.

**CAUSE OF ACTION UNDER
SECTIONS 523(a)(2) AND 523(a)(3)(B) OF THE BANKRUPTCY CODE**

35.    The Consumer First Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 32 as if fully set forth herein.

36.    Under Rule 4007(b) of the Bankruptcy Rules, there is no time limit for bringing a nondischargeability complaint under section 523(a)(3)(B). Section 523(a)(3)(B) of the Bankruptcy Code provides that a debtor is not discharged for a debt of a kind specified under section 523(a)(2) if the creditor was not listed or scheduled and had no notice or actual knowledge of the bankruptcy case in time to file timely proofs of claim and request for a determination of nondischargeability complaint. Section 523(a)(2)(A) of the Bankruptcy Code provides that a debtor is not discharged from any debt to the extent the money was obtained by false pretenses, false representation or actual fraud.

37.    As set forth above, Daloya, through his role as sales manager and team leader at Consumer First, engaged in a fraudulent course of conduct that caused extensive damage to the Consumer First Plaintiffs.  The restitution and punitive damages to which the Consumer First Plaintiffs are entitled as a result of Daloya's fraudulent conduct are debts for money obtained by false pretenses, false representation, or actual fraud.

**I.    The Consumer First Plaintiffs have nondischargeable
claims under section 523(a)(3)(B) of the Bankruptcy Code**

38.    Section 523(a)(3)(B) states:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . neither listed nor scheduled under section 521(a)(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit . . . , if such debt is of a kind specified in paragraph (2) . . . of this subsection, [a] timely filing of a proof of claim and timely

> request for determination of dischargeability of such debt under . . . such paragraph[], unless such creditor had notice or actual knowledge of the case in time for such timely filing and request.

39.     A creditor that satisfies the requirements of section 523(a)(3)(B) has

unlimited time to file a complaint to determine nondischargeability.  If a creditor is

properly scheduled, or has notice or actual knowledge, and holds a claim of the kind

specified in section 523(a)(2), (4) or (6), the creditor must file a complaint for

nondischargeability within 60 days after the first date set for a meeting of creditors under

section 341(a).  *See* Fed. R. Bankr. P. 4007(c); 11 U.S.C. § 523(c).  If a creditor is not

scheduled or does not have notice or actual knowledge, then the creditor has an unlimited

amount of time to bring their complaint to determine nondischargeability.  Fed. R. Bankr.

P. 4007(b).  *See also In re Candidus*, 327 B.R. 112, 117 (Bankr. E.D.N.Y. 2005)

("[Federal Rule of Bankruptcy Procedure] 4007(b) specifically affords the creditor the

right to litigate the dischargeability of alleged intentional tort debt outside the prescribed

time limits."); *In re Garland*, 501 B.R. 195, 200 (Bankr. S.D.N.Y. 2013) ("Overstating

the matter only slightly, a section 523(a)(3)(B) complaint as to nondischargeability of a

debt can be brought any time, any place.") (quoting *In re Bartomeli*, 303 B.R. 254, 269

(Bankr. D. Conn. 2004)); *In re Strano*, 248 B.R. 493, 502 (Bankr. D. N.J. 2000) ("[A]

debtor who fails to schedule an intentional tort debt before the bar date loses the benefit

of . . . the bar date.").

40.     Section 523(a)(3)(B) is satisfied if (i) the creditor was known to the

debtor; (ii) the creditor was not scheduled in time to permit a timely complaint for

nondischargeability; (iii) the creditor was not otherwise aware of the bankruptcy; and

(iv) the claim is of the type specified in section 523(a)(2), (4) or (6).  *In re Lerner*, 515 B.R. 26, 31 (Bankr. E.D.N.Y. 2014); *Garland*, 501 B.R. at 199.

41.    The Consumer First Plaintiffs were undeniably known to Daloya.  Daloya was served with the Lawsuit in March 2012, and he signed a stipulation extending his time to answer the Verified Complaint in June 2012.[57]

42.    The Consumer First Plaintiffs were not scheduled in time to permit them to file a timely complaint for nondischargeability.  Daloya's Schedule F list of unsecured creditors did not include any of the Squassoni or Consumer First Plaintiffs, nor did it include Davis Polk, Linda H. Mullenbach, Meredith Horton or the Lawyers' Committee for Civil Rights Under Law.  Nor were any of them scheduled in either of Daloya's two amended schedules.

43.    The Consumer First Plaintiffs were not otherwise aware of Daloya's bankruptcy.  Indeed, neither the Consumer First Plaintiffs, Davis Polk nor the Lawyers' Committee for Civil Rights Under Law were aware of Daloya's bankruptcy until more than a month after his discharge.

## II.    The Consumer First Plaintiffs have claims of the kind specified in section 523(a)(2)

44.    Section 523(a)(2)(A) includes debts "for money . . . obtained by false pretenses, a false representation, or actual fraud."  To show that a debt is nondischargeable under that section, a creditor must establish (i) that the debtor made a false representation; (ii) that the debtor knew the representation was false at the time it was made; (iii) that the debtor made the false representation with the intent to deceive the creditor; (iv) that the creditor justifiably relied; and (v) that the creditor sustained a loss

---

[57] Stipulation to Extend Time, June 8, 2012, Stillman Decl., Ex. A.

that was proximately caused by the false representation. *In re Suarez*, 367 B.R. 332, 338 (Bankr. E.D.N.Y. 2007).

45.     In determining whether the debtor made a false representation, it is well established that the actions of someone other than the debtor may be attributed to the debtor. *In re Zaffron*, 303 B.R. 563, 571 (Bankr. E.D.N.Y. 2004) (citing *Pisano v. Verdon (In re Verdon)*, 95 B.R. 877, 882–83 (Bankr. N.D.N.Y. 1989)).  "[A] debtor who has made no false representation may . . . be bound by the fraud of another if a debtor is a *knowing and active* participant in the scheme to defraud." *MacDonald v. Buck (In re Buck)*, 75 B.R. 417, 420–21 (Bankr. N.D. Cal. 1987) (emphasis added).  A court should be "concerned with ensuring that perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." *Phillip v. Reecher (In re Reecher)*, 514 B.R. 136, 152 (Bankr. D. Md. 2014).

46.     Moreover, at least two courts have found that an employee of a loan modification company that defrauded consumers can be held liable for a nondischargeable debt under section 523(a)(2), even if it was not the debtor himself that induced the creditor's reliance.  In *Blackmon v. Evans*, the debtor was the treasurer of a company that took title to distressed homeowners' homes and procured rent payments from the homeowners under the guise that the company would obtain a new mortgage and use the equity remaining after payment of the fee to pay the homeowner's bills.  410 B.R. 137 (Bankr. M.D. Fla. 2009).  The homeowners were promised a clean credit history in return; in actuality, the company took title to the property and obtained a mortgage loan, which they made no or few payments on, encumbering the property and leading to the homeowners' loss of their houses through foreclosure within a few months.

*Blackmon*, 410 B.R. at 137.  In *Chandler v. Alexakis*, the debtor was an employee at a

company that found struggling homeowners and promised to negotiate with their lenders

to get them out of foreclosure proceedings.  The company took an upfront fee and did not

perform the promised work.  *Chandler v. Alexakis (In re Alexakis)*, No. 11-3164, 2012

Bankr. LEXIS 5795, at *1–*27 (Bankr. S.D. Ohio, Sept. 6, 2012).

### A.    *False Representations*

47.    Daloya was one of the core perpetrators of the Consumer First fraud.

Daloya and Guy Samuel, one of the owners, shared an office right behind the

salespeople.[58]  It was Daloya who, together with Samuel, ran weekly sales meetings at

which salespeople were given instructions on how to carry out the company's fraudulent

practices.[59]  One former salesperson testified that Daloya and Samuel were "in charge of

Consumer First['s] . . . day to day operations,"[60] and that Daloya was a partner at

Consumer First Law Group.[61]

48.    Daloya's sales team, under Daloya's training, direction, and supervision,

made false representations to the Consumer First Plaintiffs to induce them to pay upfront

fees to Consumer First.[62]  The sales team told the Consumer First Plaintiffs that they were

retaining the services of a law firm.  In fact, for the overwhelming majority of the time,

no one at Consumer First was licensed to practice law in New York, where the "law

firm" was located.  The sales team told the Consumer First Plaintiffs that an attorney

would oversee the mortgage modification process.  In fact, other than one junior attorney

---

[58] Quinn dep at 25:6-13, Vonnegut Reply Decl., Ex. A.
[59] Id. at 39:19-40:4.
[60] Id. at 63:17-24.
[61] Quinn dep at 143:17-24, Vonnegut Reply Decl., Ex. A; Tr. of Aug. 14, 2012 Dep. of Guy Samuel at 129:8-24, Vonnegut Reply Decl., Ex. B.
[62] Verified Compl. ¶¶ 105-166, 619-690, Vonnegut Decl., Ex. A.

who worked at the business briefly, Blackwell was the only "attorney" at Consumer First, and he was not licensed anywhere but in Nevada. The sales team told the Consumer First Plaintiffs that the attorney would negotiate with their lenders. In fact, the majority of the Consumer First Plaintiffs' lenders were never contacted by Consumer First. The salespeople lied about Consumer First's relationship with lenders,[63] told clients not to contact their lenders[64] and not to pay their mortgages so as to get a negotiation advantage.[65]

49.    The salespeople were also instructed to tell clients that if they engaged Consumer First, their lenders could not foreclose on their homes—a blatant falsehood, given that some of the Consumer First Plaintiffs subsequently lost their homes to foreclosure.[66] They threatened the Consumer First Plaintiffs that they were "going to lose [their] home if [they] don't do something."[67]

50.    Daloya and Samuel told the salespeople to lie about Consumer First's success rate.[68] Samuel and Daloya told the salespeople at Consumer First to say "whatever you have to say to make our company look like we know what we are doing."[69] Daloya also did nothing when, early in Consumer First's lifespan, he was informed (if he was not already aware) that the salespeople were saying inaccurate things to potential customers.[70]

---

[63] Quinn dep at 243:17-244:5, Vonnegut Reply Decl., Ex. A.
[64] Id. at 234:21-235:2.
[65] Id. at 250:3-10.
[66] Id. at 228:16-229:4.
[67] Id. at 40:15-22.
[68] Id. at 230:2-16.
[69] Id. at 109:10-21.
[70] Id. at 141:8-146:1.

51.     In reality, none of the Consumer First Plaintiffs received a loan modification on the terms promised to them by Consumer First and its employees.  If skeptical of the "sales pitch," the sales team told the Consumer First Plaintiffs that they would receive a full refund if Consumer First was not successful.  In fact, no Consumer First Plaintiff received their promised refund.[71]

52.     Daloya knowingly and actively participated in this scheme to defraud the Consumer First Plaintiffs.  Each Consumer First Plaintiff heard the same series of lies.  By training the salespeople on how to sell, Daloya caused them to make a series of false representations to the Consumer First Plaintiffs in order to achieve a sale.  He was integral to the scheme, as the person who hired, trained, supervised, distributed "leads," and handled complaints.[72]

### B.  Knowing

53.     Daloya knew that the statements being made to the Consumer First Plaintiffs were false.  The entire business of Consumer First operated to fraudulently obtain upfront payments for purported loan modification work.  Daloya helped create Consumer First,[73] and he stayed until it collapsed.[74]  Daloya and the other Defendants purposely targeted and took advantage of the financial vulnerability of the Consumer First Plaintiffs by knowingly making false statements to them to obtain upfront payments that they then absconded with.

---

[71] Verified Compl. ¶¶ 619-690, Vonnegut Decl., Ex. A.
[72] Tr. of Aug. 17, 2011 Dep. of Matthew J. Lapides, 73:20-73:25, 104:14-104:19, Vonnegut Decl., Ex. F; Verified Compl. ¶ 97, Vonnegut Decl., Ex. A.
[73] Tr. of Sept. 9, 2011 Dep. of Jake Daloya at 46:8-20, Vonnegut Reply Decl., Ex. C.
[74] Id. at 80:14-81:6.

### C.  Intent to Deceive

54.     The statements were made with the intent to deceive.  The operation of Consumer First was designed to fraudulently obtain upfront payments for purported loan modification work.  The companies and their employees made false and misleading statements about the type of work that they did, the likelihood of success, and the customers' ability to obtain a refund.  And they did so with the intent to persuade the Consumer First Plaintiffs to pay their upfront fees.[75]

### D.  Justifiable Reliance

55.     The Consumer First Plaintiffs were justified in believing the statements of the Consumer First sales team.  The Consumer First Plaintiffs, low- and middle-income homeowners struggling to keep up with their mortgage payments, were looking for help and support.  They found Consumer First through seemingly legitimate websites, like obamaHAMP.net.  They heard a calculated sales pitch that was designed to lure them into a false sense of security, using the facade of a law firm as a way to gain their trust.[76] Given what they knew of Consumer First, they justifiably relied on the promise of a lawyer's help and guaranteed success, or their money back.

### E.  Causation

56.     The Consumer First Plaintiffs' loss was proximately caused by Daloya. The Consumer First Plaintiffs lost money and, in some cases, much more as a result of Daloya's participation in the Consumer First scheme.  Daloya hired, trained, and supervised the sales team that called the Consumer First Plaintiffs, convinced them to pay their upfront fees, assured them that a lawyer would negotiate with their lenders and

---

[75] Verified Compl. ¶¶ 105-166, 619-690, Vonnegut Decl., Ex. A.
[76] *Id.*

guaranteed success.  At no point did Daloya try to stop these practices or unravel this fraud.  Instead, Daloya knowingly and deliberately facilitated Consumer First's fraud at every stage of the process.  Daloya played a pivotal role in perpetrating the Consumer First fraud from distributing sales leads to his team to handling the inevitable refund requests from customers who realized too late that they had been swindled.[77]

57.    Daloya, as a partner, floor manager, and team leader, was intimately and personally involved with the fraudulent loan modification scheme being perpetuated by Consumer First and was aware of and expressly encouraged and caused the salespeople at Consumer First to make misleading representations.  Those actions had significant consequences for the Consumer First Plaintiffs' lives.  As a result of Daloya's role in the Consumer First scheme, the Consumer First Plaintiffs have claims against Daloya that are nondischargeable pursuant to sections 523(a)(2) and 523(a)(3)(B).

---

[77] Verified Compl. ¶ 97, Vonnegut Decl., Ex. A; Tr. of Sept. 9, 2011 Dep. of Jake Daloya, 64:23-64:25, Vonnegut Decl., Ex. C; Tr. of Aug. 14, 2012 Dep. of Guy Samuel, 129:8-129:24, Vonnegut Decl., Ex. D; Tr. of Aug. 25, 2011 Dep. of Aren Goldfaden, 193:4-193:11, 254:1-254:16, Vonnegut Decl., Ex. E; Tr. of Aug. 17, 2011 Dep. of Matthew J. Lapides, 73:20-73:25, 104:14-104:19, 135:6-135:20, Vonnegut Decl., Ex. F; Quinn dep at 25:6-7, 39:19-40:4, 63:17-24, Vonnegut Reply Decl., Ex. A.

WHEREFORE, Plaintiffs respectfully request that the Court:

1.      Declare that the Consumer First Plaintiffs' claims for damages against Debtor are nondischargeable claims for money obtained by false pretenses, false representations or actual fraud pursuant to sections 523(a)(2) and 523(a)(3) of the Bankruptcy Code.

2.      Grant the Consumer First Plaintiffs such other and further relief as the Court deems just and proper, including reasonable costs and attorneys' fees.

Dated:   July 7, 2015
         New York, New York

                              Respectfully submitted,


                               s/ Arie Rubenstein
                              _____
                              Elliot Moskowitz
                              Daniel F. Kolb
                              Eli J. Vonnegut
                              Arie Rubenstein
                              Jillian Rennie Stillman
                              DAVIS POLK & WARDWELL LLP
                              450 Lexington Avenue
                              New York, New York 10017
                              Telephone:     (212) 450-4000

                              *Attorneys for Consumer First Plaintiffs*